Miss Schwartz. You may proceed. Thank you, Your Honor. May it please the court. My name's Leah Schwartz appearing on behalf of the appellants. I'd like to reserve about four minutes of my time today for rebuttal. Before you start, I noticed the judge Phillips is muted and he might have a question. So let's start again at 15. But, uh, I'm going to go ahead and start with the question. He may be having the same problem I'm having. You had to go up to the top. You just you can't. Okay, good. I'm in. I guess it automatically moves you. Yeah, yeah. Okay. Start again. I'm sorry. Miss Schwartz, please proceed. Thank you. The appellants are two entities, Eighteen Seventy LP and the Marie Kennedy Foundation, and they're referred to in my briefing, and I'll refer to them here today as the Wyoming entities. And there's good reason for that. They conduct their business in Wyoming. They're registered to conduct business in Wyoming. They have their principal place of business in Wyoming, and a majority of their owners and managers live there. In fact, the families live there for generations. The traditionally accepted place of business is Wyoming. This is a personal jurisdiction case in which the plaintiffs allege that they are the victims of a fraudulent scheme perpetrated by three individuals, a lawyer, a CEO and a CFO, all affiliated with this international outfit comprised of various entities known as crew. Two of these individuals were sued previously in Florida, where a default judgment was taken against them after the determination that the Florida court had jurisdiction. Now here, the Wyoming entities seek recovery against the third individual, the chief financial officer, Mr. Jason, who contends he is not subject to the jurisdiction of the court in Wyoming, or for that matter, any court in the United States. We contend that this cannot be the proper result, and in fact, Mr. Jason's contacts targeting known Wyoming entities are more than sufficient to establish minimum contacts in the state, particularly when the court construes the well-pleaded facts in the plaintiff's favor, as it must. Well, whether or not Mr. Jason is subject to suit in any other court in the United States really is not before us, right? It's just whether he's subject to suit in Wyoming. I think that's absolutely right, Judge Holmes. That's the issue presented. And I'm focusing on that. I know that your brief goes to considerable length to say that Walden is distinguishable from this case, but I'm sort of struck by some language in Walden in talking about Calder and describing that in Calder, unlike in the Walden case, you had a story that relied on California sources, was focused on plaintiff's activities in California, the nature of the alleged tort involved defamation that would have reputational impact in California. And they contrasted that with Walden, who could have suffered precisely the same harm wherever that couple was, the harm of loss of access to their money, whether they were in Nevada, whether they were in California, whether they were in Mississippi. It's not really clear to me why the Wyoming entities, as you call them, are not similarly situated to the plaintiffs in Walden in the sense that Wyoming really has nothing to do with the harm that they suffered, at least as I can discern. What in your complaint makes this uniquely a Wyoming interest other than the fact that the entities are based in Wyoming? Thank you for the question. I do think Walden is in fact distinguishable from the facts here. It strikes me that that case talked a lot about the chance, as you say, associated with the plaintiff's residence. The cop at the airport might as well have been sued in any number of states, depending on where the couple landed after they got home from their flight. That is an opposite to the facts here, where we have a Wyoming entity who was targeted, known to be in Wyoming. The tort was partially committed, indeed, within Wyoming, where the misrepresentations were directed. Wait a minute. The point was that the entities are in Wyoming. The defendant knows they're in Wyoming. That doesn't mean that he's expressly aiming to address Wyoming. That is the point that was raised in Walden, which is that that couple could have suffered exactly the same harm without implicating any interest related that was unique to Nevada. The question again that I'm asking you is, what is it about this connection that uniquely implicates Wyoming? The Wyoming entities, as you call them, seemingly could have suffered that same harm anywhere without implicating anything unique to Wyoming. Contrast that with Calder, which had all of these uniquely California-based interests that were implicated by the tort in play. Walden drew that contrast. What I'm saying is, why didn't that same contrast apply here? The torts are qualitatively different, but the things that I would highlight, Judge, are that while we may not have a business here with physical operations, like the plaintiff entity in the Newsom case, they may not be engaged in sewing fabric in a shop like the plaintiff in Dudnikov, they undoubtedly have their operations in Wyoming. Simply because their operations are less tangible does not mean that they are not centered here. Well, that's an interesting point, because that gets to the next question I was going to ask you. Why doesn't, for purposes of this fact-driven analysis, why doesn't the nature of the business matter? And you teased out, yes, exactly the nature of those two other businesses, and there it was clear there was an impact on the forum. And so the fact that your clients have their principal place of business in Wyoming says nothing about the fact that the tort would have any unique impact on Wyoming. Apart from their presence there, which Walden tells us really should not, nothing should turn on the presence, per se, of the plaintiff in that place. Thank you, Judge. I would just turn back to the fact that it's the nature of the tort here, and the financial loss that is alleged, that is significant. That's what I want to touch on very briefly. You say financial loss, and in the reply brief you say that the transactions, the $9.9 million, over time, individually made, that initiated the transfer of funds from Wyoming. Is that pleaded, and is that in the record, that in fact the money that was sent, the money that was lost, the $9.9 million, whatever, came from Wyoming? I don't think that that is pled as to the specific counts, Judge, or the accounts, rather. However, it is pled that the controlling and voting member of 1870 LP, and the majority of members, lived in Wyoming. So this is an investment decision-making business. The decisions were made, initiated, voted upon in the state of Wyoming. Sorry, please continue. I didn't mean to interrupt your answer. That's okay. So, you know, I appreciate we have different frameworks at play in these cases dealing with contractual relationships, torts, but this court has been clear that the overriding inquiry is, is this particular out-of-state defendant being called to account for merely random, fortuitous, attenuated contacts with the form state? I don't think there's any question that we have Wyoming contacts here. The plaintiffs are Wyoming entities. They were targeted, specifically targeted. There's references to a broad campaign to solicit investors, but let's not forget that these Wyoming entities became the single largest investors of Group, and extended significant loans to the company on the solicitation of the founders, including Mr. Jason. Well, let me ask from the point of view of the defendant. Why would he think he's dealing with Wyoming without going into the corporate records and seeing where something's incorporated? He dealt primarily with the family member in Florida. He might have copied on emails, people in Wyoming. He didn't come to Wyoming. But just, just from his point of view, wouldn't he be a little surprised to see that he's subject to being hailed into court in Wyoming? Or respond first, whether this is a, this is a legitimate way of looking at it, to look at, to look at this from the point of view of the defendant, whether he would think he's involved in Wyoming. I do think that's a legitimate way of looking at it. And, and it is equally legitimate to cite all the record instances of the references to Wyoming that put Jason on notice that he was dealing with Wyoming entities. The only way we conclude otherwise is if we construe those facts in his favor and make the tremendous leap to believe that the CFO of a company didn't know who its largest investors were, didn't know who the lenders were on loans he was soliciting, and approving in board minutes referencing the entities Wyoming Citus. That actually raises an issue of our standard of review on this sort of thing. Are you saying that if someone could infer the necessary facts or the necessary understanding by the defendant, then that's enough? Or doesn't the district court, isn't it empowered to actually make findings regarding these things and decide what the facts most reasonably suggest? I don't think so, Judge. This is de novo review. And the standard compels this court to resolve well-plaid facts in the plaintiff's favor. I'm saying that these facts are not, these facts are not just alleged on a conclusory basis. They're well-supported by the record. And the same way that those facts were construed in the plaintiff's favor in Dudnikov, we have to find the same truth here. It wasn't just a mere allegation of, oh, he knew. He knew because X, Y, Z. Look at the documents. Look at the documents he signed reflecting the Wyoming dress repeatedly. So he knew they were in Wyoming. But again, this gets back to Walden, which says, is it your premise that it's enough that he knew that they were in Wyoming if there was no uniquely Wyoming interest implicated by the transaction? And in addition to Walden, what I draw your attention to in responding to that question is the Ninth Circuit Schwarzenegger decision, which we talk about in Dudnikov and in Newsom, in which you had this business, you know, using the Terminator information, where the court said, yes, the defendant probably, I mean, the plaintiff probably knew, well, the defendant probably knew that Schwarzenegger was in California, knew that's where he was, but that wasn't the focus of what the defendant was trying to do. He was trying to boost his business in whatever state he was in. So is it your premise that it's enough? You did a great job laying out these instances in the brief, which could lead to the inference that Jason, I guess it is, Jason knew that the Wyoming entities were based in Wyoming, but is that enough? Full stop? No, it's not enough, Judge. And that's why we have cases in which a principal place of business is described, circling back to this language, as a mere fortuity, when that's the only thing connecting the defendant's conduct to the jurisdiction. And why is that all we have here when, going back to the point, nature of business really may matter here. Why isn't that all that we have here, but the mere fortuity that they set up shop in Wyoming, lovely state that it is, why, why, why does that, why does that matter? Because the torts were directed at extracting funds from these Wyoming entities in Wyoming. And that goes back to Judge Phillips' point. If you haven't pledged that those funds came out of Wyoming, that in some sense they had some unique impact on Wyoming, then it's just the mere fortuity that they happened to set up shop in Wyoming. Where would the damage be felt if it were not in Wyoming, respectfully, Judge? Well, they had a suit in Florida, didn't they? They had a what now? They had a suit in Florida, didn't they, in a separate litigation where there was held that there was personal jurisdiction. I know Mr. Jason wasn't involved in that. But I mean, there was, they found that there was personal jurisdiction there, that there was damage there, right? Correct. Based on the injury to a resident member of the company. The basis for jurisdiction here is far superior when we have a majority of members living in Wyoming, and the company itself situated there. I'd like to reserve the rest of my time for rebuttal. Well, I'll give you some time for rebuttal, but I want to pursue the question I asked earlier, because I hadn't thought about it before. And I noticed in your brief, you say that we take as true all well pleaded facts with respect to personal jurisdiction and conflicting affidavits are resolved in the plainest favor. But that's, I assume, just for this stage of the litigation. At some point, these facts can be disputed. And the result, the judge makes findings on those facts, and that those findings would determine whether or not there's personal jurisdiction. Is this just a temporary thing? And if we decide this because we construe certain facts in your favor, as not, well, let's stay with that, that then later in the district court, the defendant could put on additional evidence that would lead to the district court to say, I don't have personal jurisdiction. What happens in the future? It's strange to say we're making a decision based on facts, and we just have to assume everything you say is true. That's not the situation for subject matter jurisdiction, I know. Can you help me on that? Sure. You know, and if the district court had conducted or elected to conduct an evidentiary hearing, there'd be a different standard. If the appellee had requested an evidentiary hearing, there'd be a different standard. I think it's speculative to guess what evidence Jason might be able to muster to say, oh, in fact, I subjectively didn't know or could not be deemed to have known about the Wyoming entity's existence in Wyoming when that is fully established by the record evidence. And essentially is constructive notice. But would anything bar this issue from being revisited? I didn't get I was I had focused on the standard and my impression was the answer was no. I've never seen a case in which it is judge revisited that is. Okay, thank you. Mr Garrett, your response, and you're you're muted right now so you okay good. May it please the court counsel. My name is Tyler Garrett and I appear today on behalf of the appellee Richard Jason. Let me start you off with the money, because we're interested in that and it seems like it's an anchor that might drag, if not hold. And it sounds like there's nothing in the record or pleaded that the money came out of Wyoming, but it is established at least for purposes of review that you have a Wyoming entity. That is $9.9 million poor. Why isn't that enough wherever the money happened to be located when it was dispersed. That's different than Walden. Judge Phillips, I think I would start with the complaint first, and I'm looking at it now and there aren't allegations that the money came out of, at least at what I'm reviewing now came out of Wyoming. And I would direct the court to the Florida case, and take a look at Paul Kennedy's affidavit, and how the end the court's personal jurisdiction order, and the award of the money based upon what was alleged and damages by the Kennedy entities, the Kennedy Kennedy entities were parties to the Florida action. And so I think, to your question of where the finances are where was the harm. You know where was the harm where the, where were the, where was the loss I think Florida is where it's already been alleged. That's how the, that's how the Kennedy entities had to argue in front of the Florida court to overcome the Calder test. Where did the brunt of the injury occur the third element. And if they've alleged there and burn their powder there then it goes to well. To your point, well, how can they have suffered loss here in Wyoming. Oh, two, two things to tease out of that one wasn't Paul Kennedy didn't he claim that he personally lost money in Florida. Yes, yes the plaintiffs were Paul Kennedy and the Kennedy entities. And when I refer to the Kennedy entities. It's the two entities here at issue in this case as well. Okay, well he, that could have provided a basis why there would have been harm in Florida that is distinct from the harm here was all we have here are the Wyoming Kennedy entities right. Correct. Okay. All right, go ahead, please. Oh, so I think to judge homes to your point, you know, yes, Paul Kennedy was a, an individual in that case as well because he had separately loaned or invested or something into group as well. And so, not only Paul Kennedy but the Kennedy entities were all seeking damages in the Florida case which they obtained through a default judgment after the court rendered or ruled that there was personal jurisdiction all over those parties in Florida. Okay, my second question is returned to me now and my second question is, there's some there was some, at least a subtext in your brief and I want to be clear whether this is what you're saying is that there can be only personal jurisdiction in one place. I mean, why, why could there not have been personal jurisdiction, theoretically over Mr. Jason perhaps in Florida, or what or let me change that question. Why could it not be the case that there was personal jurisdiction, both in Florida, and in Wyoming. At the same time, I mean you could have theoretically in the course of this transaction have contacts that were sufficient for both places right. You know, that's an interesting question and really the responses to towards the argument of the appellants, and their citation to the Ninth Circuit's opinion in Dole Foods v. Watts, you know, for the proposition that a business entity may both be located and suffer injury in more than one forum. And in that case, you know, the Ninth Circuit explained that, you know, the principal place of business could could be where the harm occurred. It could be in another place. And it went through the analysis as to where Dole Foods U.S. suffered that harm and ultimately ruled in California. And what the appellants did not cite, though, in their brief was the qualifying conclusion in Dole Foods and that and the Ninth Circuit stated the principal place of business of Dole Foods U.S. in California and Dole managers in California were induced to approve the injurious transactions. Under these circumstances, we find that Dole U.S. suffered jurisdictionally sufficient economic harm in California. Because of the separate express aiming requirement or holding that Dole suffered economic harm in California does not mean that the forum in which a corporation has its principal place of business will always have personal jurisdiction over foreign defendants. But when a forum in which a plaintiff corporation has its principal place of business in the same forum toward which defendants expressly aim their acts, the effects test permits that forum to exercise personal jurisdiction. And so when we look at that Ninth Circuit case, that makes sense. And how they concluded with that qualifying language, because then to the next point, Judge Holmes, we go back to Walden. And Walden teaches us, as the court in NZERI says, Walden teaches us that personal jurisdiction cannot be based on interactions with a plaintiff known to bear strong connection with the forum state. So here, all we have is that second prong of the Calder test and the facts alleged in the complaint and the jurisdictional discovery that's been netted. All that it establishes is that the Kennedy entities had a principal place of business in Wyoming. That's it. There's really nothing more to connect Jason's alleged conduct that occurred in Switzerland, his breaches of fiduciary duty and gross negligence to Krupp, a Swiss-based company, that those were purposely aimed or the focus was Wyoming. But I'm asking, I wanted to, and I think I understood you, but I want to be clear. You aren't suggesting that they couldn't have expressly aimed their conduct both at Florida and Wyoming. The fact that there was personal jurisdiction found in Florida is not a game changer to determine this question of whether there's personal jurisdiction in Wyoming. I think that's, you know, I go back to the theoretical matter. I thought that's what I heard you say, as it relates to Dole. I think the bottom line would be that, regardless, there has to be focus in both states, right? So in Dundekoff, there was a bank shot, and it was going to Colorado. Here, I guess it would be a double, you know, two baskets trying to shoot in both hoops, or it could be a left layup and a right layup, banking off of Florida. Don't get too far. You know what I'm saying? It's kind of that thing of maybe there could be, but the bottom line is that there has to be allegations or well-put facts and evidence that establishes that there was a focus of the actions in both, in a number of states. And here, there isn't in Wyoming, but there has been alleged in Florida. And this raises another point. Judge Hartz, you know, you had mentioned the well-pled facts. What do you have to take it on? And I would cite to your opinion in Ex Mission, where you stated that we must accept as true the well-pleaded, that is, plausible, non-conclusory, and non-speculative facts alleged in the complaint, unless they are controverted by sworn statements. So, when we apply this principle, along with the other applicable principles part of the standard of review, the allegations in the complaint that can be considered well-pleaded facts and the evidence provided through jurisdictional discovery do not establish that Mr. Jason purposely directed his activities at the appellants in Wyoming and that the appellant's injuries arose out of Mr. Jason's alleged form-related activities. And I would, for instance, I would cite the court to pages 9 through 16 of the Kennedy entity's brief, listing out alleged actions in the complaint concerning the loans and other subsequent investments through which they attempt to connect Mr. Jason to Wyoming. However, several of the allegations and facts they cite concern third parties, such as Mr. Robertson, Mr. Berrar, and Paul Kennedy. And another example is on page 37 of the Kennedy entity's opening brief, where they state Jason had a close relationship with the Kennedy entity brothers. He undisputedly knew of Paul's residence, Paul being Florida, and he worked closely with CEO Robertson, who undisputedly knew of Peter's residence. And it's this type of dependence on third parties to connect Mr. Jason to Wyoming that makes it so important for the court to study the citations in the Kennedy entity's briefing and the allegations in their complaint. I get that. Given the nature of their allegations of tortious conduct, why is that entirely surprising? Because, I mean, part of their allegations of breach of fiduciary duty is that he had responsibilities but remained silent. In other words, if he saw that third parties were ripping off the Kennedy entities or Wyoming entities, whichever phrase you want to use, and he stood silent, and he knew they were in Wyoming, he knew they were being ripped off, he knew – and to their allegation, he had a fiduciary duty to say, no, stop. Why is it surprising that there are third party actors involved, and yet he had knowledge that would link him to the conduct that was going on in Wyoming? Well, I think we have to go back to precedent, and we could go back to Walden. And it has to be the actions of the defendant himself, not of third parties, not of the plaintiffs. And so I think that would – misrepresentations that are alleged, and the defendant here being part of the parties who are benefiting by sliding the intellectual property behind their back and work in concert with Mr. Robertson, can he really just isolate himself off and say, me, only me, when it was this group activity? Well, I think I'm trying – it's hard to dissect that from precedent that I believe firmly says that it has to be – we have to look at the affirmative conduct and contacts of the defendant himself. But I would go back to the whole grouping of these other folks. They were already sued in Florida based on the same contacts, and Paul was the main contact with these Kennedy enemies. And so if we look at it from a group standpoint, they've already been sued in Florida, but now we can take those same facts based on their conduct – that is, Burrard and Robertson – and graph that onto Jason here in Wyoming and replace Paul with Peter because Peter lives here in Wyoming, and that's enough for minimum contacts. Well, that makes – that goes back to my point that theoretically there's no – you could have contacts in both forms, and if Jason's responsibility is that he did not act to stop when he had an obligation to do so, then you've got a situation in which he knows what they're doing. And no, this – Walden, despite the fact that it has general principles that apply here, the factual situation in Walden was dramatically different than what we have here, and the nature of the claim is dramatically different. So shouldn't – aren't we driven by both? I mean, you have to accept the fact that the business context matters here, but you also have to accept the fact the claim matters, right? Correct. Yeah, and I think, you know, we look at the bookends of – we have cases like, you know – we have cases like Dudnikov and Calder and Newsom on one end and Bartle Roofs, and then on the other end we have Walden and Zuri's ex-mission. But to the factual point, Judge Holmes, in addition to these cases, because of the Kennedy entity's reliance on principal place of business, in order and judgment issued by this court in Grinberg v. Ivanhoe, merits mentioning, Judge Holmes, you penned the O&J, and Judge Hartz, you were on the panel in that case. And when writing Appellee's Brief, I was on the fence as to whether it was judicious to cite this case, and ultimately I decided not to in light of it being unpublished and therefore persuasive rather than precedential pursuant to Appellate Rule 32.1 and the Tenth Circuit's corresponding local rule. But given the author, you shouldn't have cited it. … upon reflection and preparing for oral argument. And I'm sure I was stood with by Judge Holmes. But I believe Grinberg offers helpful guidance in this case when assessing the second and third prongs of Calder because Appellee did not cite – we didn't cite this case in our brief. I would be happy to submit a Rule 28J letter setting forth a citation to the case if you want. I'm happy to do so. What's the principle that you take from that? How is it helpful? Well, I know my time is limited, so I was going to kind of give a rundown of the facts, but you know the facts and you know the holding. The logic in Grinberg translates to this case. Like the focal point of the alleged tort in Grinberg was Ecuador, where the oil field was located, and where Contendo was injured when Ecuador allegedly canceled plaintiff's concessions. In this case, the focal point is Mr. Jason's alleged breach of fiduciary duties and gross negligence in Switzerland, where Jason was working for Croup as its CFO and where the alleged injury occurred when Mr. Jason committed the alleged torts towards Croup. And when we look at Grinberg, we said because the Ecuadorian contract was canceled, for that reason, plaintiffs did not satisfy the second prong of the Calder test. And to the third prong, where was the alleged harm actually felt? Grinberg felt internally that their injury was in Colorado, even though they said, well, our principal place of business was in Ecuador, even though our principal place of business was in Colorado. And so, you know, in response to those arguments, the court explained that a principal place of business in the forum state could be nothing more than a fortuity and ruled accordingly. And I think that that holding is helpful in this case, based on the factual circumstances. So I see my time is nearly up and would like to conclude by thanking the court for its time and consideration concerning this case. For the reasons set forth in his brief and as discussed today, Mr. Jason respectfully requests the court affirm the Wyoming District Court's dismissal of appellant's claims due to the absence of personal jurisdiction. Thank you. Thank you. Ms. Schwartz, I'll give you a minute. Thank you. Quickly, with respect to Grinberg, that was a case involving competitors directing your activities to Ecuador in which the alleged contacts involved bribery of Ecuadorian officials. Contact in California. No contact in Colorado. I had to read the opinion a few times, the order a few times to even see that the entity was based in Colorado, the plaintiff. That is in opposite to the facts here. Jason personally signed loan documents to a Wyoming, not a Florida lender, showing Wyoming address in Big Horn, notice requirements in Wyoming, obligations to repay the Wyoming entities. I'd cite the record at page 347, showing the signatures on one line of credit, notably Richard Jason is signing this document under power of attorney of Stuart Robertson, director. To your point Judge Holmes, these were individuals working in concert, and the judge, the district court judge found that Mr. Jason was a quote primary participant in the alleged wrongdoing. For these reasons, we would respectfully ask the court to reverse the remand for further proceedings. And for the reasons stated in the brief having to do with judicial economy the sufficiency of the record below. We feel the court can address both minimum contacts and the second prong of the analysis. Thank you very much, counsel cases submitted counselor excused.